Good morning. Good morning. May it please the Court, my name is Jerry Tarutis. I'm the attorney for the plaintiff appellant, Scott Sorensen. I'd like to just briefly overview some of the, not all the facts, but where this case comes from. I actually think that this case presents some bright spots in terms of what happened here and a few dim ones as well. The bright thing is that Mr. Sorensen in this case had been addicted for almost half his life to drugs. And it wasn't until he goes to Pike Market Medical Clinic here in Seattle, gets treatment from a group of doctors and therapists, that he's finally diagnosed with bipolar disorder in August of 1996. At that point, he is able to gain control of his addiction and to go into treatment for the first time in his life. His control of his addiction is documented by your analysis in the record. And in fact, he maintains his sobriety for the next several years until the hearing in this case occurs. However, even though these doctors were able to perform what I consider a very important step in this man's life, they never were able to offer a cure. They constantly report that his depression and social phobia, the problems he has, remain. And one doctor says, despite what we've done, he says, quote, there is the overwhelming wreckage of the past which at best will only be able to be addressed gradually and carefully. And that was his treating psychiatrist in January 1999. So, although they were able to do important things, they weren't able to effect a cure here. And so what happens is if we go back in time and look at this case, this man is going to treatment. He starts in 1993 sporadically, more often in 94. In 95, he's going on a more regular basis and definitely regularized by 96. Social Security in June of 96 says, let's send him out to a consultative physician. They send him to see a man named Dr. Sherman. He doesn't get any records from Pike Market Clinic for the past three years when he sees this man. He sees him basically cold. He talks to him for a few minutes, we're not sure how long. He makes a judgment and fills out a report. Subsequently, about a year later, Social Security gets these records. The administrative law judge or ALJ says, whoa, let's send it all back and have another doctor look at this. They send it all back in 1998. This time, C. Richard Johnson, another doctor here in Seattle, examines him and does a report in February of 98. He doesn't get Dr. Sherman's report. He doesn't get any of the reviewer reports. And most importantly, he doesn't get any of the Pike Market treatment team reports that generated the reconsideration. So he makes another report, again, in the cold, based on what he's seen, based on what this man can tell him. And he basically confirms, yeah, he believes he has bipolar disorder. He makes another diagnosis of passive-dependent personality disorder. He says, I believe that on a global assessment functioning scale, which is a way of determining the effect of an illness, I would give him a 60. It's a score. It means he has moderate symptoms. It doesn't mean he's well. It doesn't mean he can work. It just means he has moderate. He doesn't explain why he gave him the 60 score. The important part is none of these consultative physicians who see this man for about an hour independently, but no notes, no treatment records, none of them get to see the Pike Market records. They know nothing of the MMPI that's been administered to Mr. Sorensen by his treatment sources. They know nothing of the evaluation. They know – Let me ask, you know, I think we have a pretty clear picture of the rather extensive history he had at the Pike Market and the documented treatment there. And then we have what both the magistrate judge and the ALJ, how they viewed these various other Sorensen-Johnson, I mean, excuse me, the Sherman and Johnson reports. I guess my question is testimony on his ability to work, even if you take the Pike Market as the leading deferential reports, which were to do as the treating physician, or which the ALJ should have done since they were the treating physicians. Is there testimony that he can't work at one of these prior jobs like landscaping or gardening, which would be totally labor and not socially related? Well, there's not – Well, first of all, the treating physicians say in their opinion that they don't believe he could work at any job, and they say that. The consultative physicians say nothing. They don't say whether he can or can't work. They don't even say whether they think he is or is not disabled. And that's what we have. Now, interestingly, the administrative law judge makes a finding, and it's on page 8 of the excerpt of the record. He says, I find that Mr. Sorensen, and I quote, has deficiencies of concentration, persistence, or pace, often resulting in failure to complete tasks in a timely manner, end quote.  And to me, unfortunately, he never says why a person who can't complete tasks in a timely manner can perform any job. In my experience, that would indicate that he can't perform any job. Where do I find in the record that the treating doctors said he couldn't work? In their, they completed a disability report in January of 1999, and in November of 1999, they completed a letter saying that they thought he was completely disabled. So we believe that they are assuming that despite their treatment, that he can't work, the decision that there is a conflict among the examining sources and the treating sources is one that is made by the ALJ based on the ALJ's interpretation of medical evidence. There is no medical evidence documenting a conflict in this case. So essentially, the ALJ is saying, I am making that judgment, whereas none of the doctors did that. For example, he says the fact that Mr. Sorensen can ride a bus to go to treatment is an example of his ability to work. Unfortunately, he never translates that in how riding a bus 10 minutes a day means that a person can work as a landscaper seven hours a day, five days a week, 52 weeks a year. And we never know what his thinking was. Are you saying that in your view, if we line up the reports, that there's not actually a conflict on the medical evidence at all? There's not actually a conflict because the consultative examiners are simply reporting, this is what I saw, this is what I asked, this is what the man said, this is my diagnosis. They do not say, I don't think this man can work. They don't say, I agree or disagree with what his treatment team has found. They don't say anything. And unfortunately, the record indicates, and Mr. Lippert, when he testified at the hearing, said, and if you read the testimony, you get the sense that Mr. Sorensen is not a good, what they call a good historian in the psychiatric sense. He's not able to explain how he feels and what's going on in his life in a very articulate way. Everybody says he's well-motivated. He tries hard. He's fully cooperative. But he has a difficulty explaining this. Unfortunately, these poor examiners who are supposed to be giving second opinions don't have their records, so their opinions have to be, by definition, very, very limited. And I would like to reserve approximately one minute for my rebuttal. And if there are no more questions. Thank you very much. Good morning. And may it please the Court, I'm Carol Hoke, here to represent the Commissioner of Social Security. This morning I'd like to cover these points with you. First, that the ALJ gave specific and legitimate reasons for rejecting the treating source opinions. Second of all, that he gave clear and convincing reasons for his credibility assessment. And third, that his conclusion that the appellant could perform his past relevant work as a landscape laborer was well-supported in the record. First, I want to consider the treating source opinions. Now, the treating sources we've just heard from Appellants Council is basically an interdisciplinary team, a psychiatrist, a physician, and a therapist. And the team members gave many opinions throughout the record that basically support appellants' claim of disability. Unlike Mr. Terutis, I believe that those opinions are contradicted by the reports of the consulting examiners, Dr. Sherman and Dr. Johnson, in that the treating source, Dr. Pittle in particular, he completed two forms on which he expressed marked and severe limitations in a variety of areas that directly relate to the ability to work, whereas the two consulting doctors both expressed that in their opinion there were only moderate limitations. You know, I'm troubled by the consulting physicians not having the records. How can we say that their opinions are worth anything? Well, I think that they have value in that they are two psychiatrists. They are MDs, both of them. And granted, they did not have the treating records. It would have been much preferable had they. But they did have the opportunity to meet with the appellant, to perform mental status examination, to gather history and listen to his presentation, and then based on their experience and their qualifications to come up with a diagnosis. And an assessment. That's precisely why we have this deference to the treating physician, because they may well have a reasonable analysis from a medical standpoint. But in order to accept that analysis, you need to, in a detailed fashion, reject the treating physician. So it would help me if you could point to where in the ALJ decision you think that the reasons for rejecting the treating physicians actually rise to the level of the specific and convincing. I would like to move on to do that, absolutely. I guess before I get into specifics with each one of the physicians and the therapist, Counselor Mr. Lippert, the one overriding point I'd like to make is that Judge Dethloff, in going through his analysis, repeatedly came back to the content of the treating records, the objective findings that were or were not in those treating source records, and pointed out that the treatment notes themselves were in conflict with the treating source opinions. So turning immediately to Dr. Grechen, who was the treating psychiatrist, as Mr. Trudis noted, Dr. Grechen gave an opinion of serious disability in January of 1999, and the ALJ rejected that based on treating notes. That is a lack of support in Dr. Grechen's own records. And for that, I'm looking at excerpt of the record, page 10. The latter paragraph there, I believe, addresses the ALJ's consideration of Grechen's opinions, talking about the treatment notes documenting fairly normal mental status exams, good response to medication, no severe symptomatology, no significant problems in social functioning, concentration, memory function, limitations in performing usual daily activities. So I think there we have a whole list, really, of what the ALJ found to be lacking in Dr. Grechen's own records to support his quite significant disability opinions. Next. Did the ALJ reject the psychologists, the clinic clinicians? There actually is not a psychologist involved on the interdisciplinary team. It's a psychiatrist, Dr. Grechen, primary care physician, Dr. Pittle, and then Fred Lippert, who is a therapist and counselor. And so is it Dr. Lippert? Mr. Lippert. We call him Mr. Lippert. He was rejected for not being a medical personnel. I agree that Judge Dethloff did note in his decision that Mr. Lippert was rejected because he was not a medical source and doctor. Would you agree that that's improper? I would. The supervision. I would. I would. And I think it's very clear that a person such as Mr. Lippert on an interdisciplinary team is a treating source and should have been considered as such. He had 26 years of practice. As I read the record, he was only short of doing his doctorate. So, yes, indeed, Mr. Lippert should have been considered as more than just a lay witness, and I would agree with that. With regard to Mr. Lippert's opinions, the ALJ, I believe it's on page, excerpt of the record 17, also noted that in his testimony, Mr. Lippert came to the hearing and testified. He was somewhat equivocal in his presentation and that, again, as I said earlier, the overriding theme I'd like to stress is that Mr. Lippert's own notes do not necessarily well support his opinion. When you get into those progress notes and look at what the appellant was saying and what Mr. Lippert was observing, many of those sessions between them had nothing to do with appellant's own mental impairment but perhaps had something more to do with the family situation or the home situation. That's the difficulty is that that's why treating physicians' opinions are respected because when you're a treating physician, your job every day when this person comes in is to say, I wonder if he's going to get social security disability. I mean, you're not writing your notes and saying, I'm going to check these boxes. You're basically saying, I'm trying to treat this individual. And so the doctor's notes as a treating physician wouldn't necessarily match up ultimately with an opinion, would they? Because in the end, the doctor's saying, I'm looking back over all my treatment of this individual. Now I'm giving an opinion. And I don't see where they're inconsistent. They may not have been specific as they went along, but I had trouble finding inconsistency. I think in some areas in the record there are quite favorable remarks, and I just jotted a few down. In the supplemental excerpts of the record, page 119, 120 to 21, 129 to 131, 139 and 153. And I just looked those over, and they have entries such as feeling much better today, not depressed. This is the appellant saying he's not feeling depressed. Those sorts of things. Responding well to medication. So I did jot those down. I hope they're helpful to you. I see that I'm running short of time, so if I might, I wanted to turn to the ALJ's consideration of the credibility of the appellant. And to talk a minute about the clear and convincing reasons that the ALJ gave for rejecting the appellant's complaints. The ALJ noted that in the record there were elements of volition, motivation. There were some references here and there to the fact that perhaps the appellant was finding it more to his motivation not to work, to continue in his pattern, so to speak. The ALJ noted that in testimony the appellant was quite vague as to what is it that keeps you from working. And the response when the court reviews that is quite vague. It's not very specific. That's consistent with his medical problems, isn't it? His mental problems. I suppose that one could find that it is, indeed. Now, didn't the ALJ also note that he was finding him incredible because he had a criminal record? Indeed. That is on my short list of points to make. Do you think that's right? Correct? In this particular case, when I was looking it over myself, I considered when is the alleged onset date, and when is the last record of criminal activity. And they're not very attenuate. I mean, they're rather close in time. So in this particular case, I think that it's one thing to consider. But I would like to stress that it is, I believe it's the very last item that the ALJ noted. After he had gone through volition and motivation, vague testimony, activities of daily living. Appellant's counsel made a point about participating in therapy and taking the bus, and that this is not a transferable skill. But it does show the ability to maintain a schedule, to be somewhere where one needs to be. And I see that I'm out of time. I just have one question to make sure that I understand. We have the three treating people, Dr. Fiddle, Dr. Grickin, and Dr. Lippert, all say that he couldn't be working. Is that right? I believe that no one came out and said, this person cannot work. But they all expressed quite severe limitations, which would obviously support that conclusion. Then the two that examined. The consulting examiners. Yes. Both of them examined for about an hour, and they say he could. They expressed moderate limitations. Neither one of them, as I recall, either said this person can work. So the whole record is in terms of what are the extent of limitations. Are they moderate? Are they severe? Are they marked? If they are, when are they? So we're kind of, at least the ALJ was weighing those treating people against two who saw him for an hour each and said moderate limitations. I would agree with that. The ALJ also looked at the state agency consultants' reviews, which can be substantial evidence also if they're supported in the record. And again, as I said earlier, the overriding point I would like to make is it's the content of those treatment notes. That's what the ALJ kept going back to over and over again. Thank you very much. I have briefly reviewed the consultative physicians' reports, and they don't say moderate at all. I don't think you'll find the words. The only thing you'll find is that Dr. Richard Johnson says that there's a GAF of 60, which if you interpret that, can be interpreted to mean moderate. I think the important part here is although counsel and counsel below were able to cite to the record, the administrative law judge in the original decision doesn't cite to any record. He doesn't say one specific date, one specific time, one specific exhibit that he finds that supports his position. He gives his general overview and says the record doesn't do this. And I think that this Court has said you have to do more than that. You have to be more specific. You have to tell us what you're relying on, where you're going, and why you're not doing it. The same way with the terms volitional and motivational. Those words are difficult to find in the reports. Everyone says this man has good cooperation, prognosis good, is working hard, et cetera. We believe when you look at the record as a whole, you'll find that Mr. Sorensen is disabled, and benefits should be awarded. What about the conclusion on Sorensen's credibility? I believe that's the same problem, Your Honor. When the ALJ concludes that he's not credible, he does not cite to what specific elements in the record indicate that he is not a credible person. Every physician that examined him, including the consultative physician, no one says that he's malingering. No one says he's not cooperating well. No one says he doesn't give good effort. All he's saying is, as I read it, what the ALJ is trying to say is, I don't think he is as bad as he thinks he is. That's what he then transfers into being not credible. I don't think the record supports that. Indeed, the objective testing, when they administered the Minnesota Multiphasic Personality Inventory, the MMPI test, it came back and said this man is severely depressed. Thank you very much. Thank you. The case of Sorensen v. Barnhart is submitted. And thanks to both counsel. I think these arguments were helpful to the court.
judges: Hug, B Fletcher, McKeown